**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| WALTER HARVEY, JR. and TORRIE RITCHIE, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>BOLEY-PAR, INC.; OPERATION PAR, INC.; and BOLEY CENTERS, INC.,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Walter Harvey, Jr. and Torrie Ritchie (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to their own acts and status, and upon information and belief as to all other matters, the investigation of counsel, and review of publicly available information as to all other matters, and by and through undersigned counsel, hereby bring this Class Action Complaint against Defendants Boley-Par, Inc., Operation PAR, Inc., and Boley Centers, Inc. (collectively, "Defendants"), and allege as follows. Non-party Personal Enrichment Through Mental Health Services, Inc., which does business as Eleos ("Eleos"), is an affiliated entity within the same corporate family. Upon information and belief, patient and client data associated with Eleos was maintained in the same information-technology environment implicated in the Data Breach. Eleos is referenced herein only as relevant to the scope, structure, and origin of the Data Breach:

## **INTRODUCTION**

1.      Plaintiffs bring this action on behalf of themselves and all other individuals similarly situated ("Class Members") against Defendants for their failure to secure and safeguard

the personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of Plaintiffs and Class Members.

2.      Defendants Operation PAR, Inc. and Boley Centers, Inc., together with their affiliated entity Eleos, are Florida not-for-profit organizations that provide mental health, substance use disorder treatment, crisis, and housing services in Pinellas County and the surrounding Tampa Bay region. Defendant Boley-Par, Inc. is the parent corporation that provides financial, administrative, and information-technology systems to Operation PAR, Inc., Boley Centers, Inc., and Eleos. In the regular course of their business, Defendants collect, store, and maintain the PII/PHI of individuals and are required to maintain reasonable and adequate security measures to protect such information from unauthorized access and disclosure.

3.      On or about June 10, 2025, Defendants detected unauthorized access to their network. Defendants later determined that an unauthorized actor accessed and may have removed files from their systems between June 6 and June 10, 2025 (the "Data Breach").

4.      Defendants owed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' PII/PHI from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII/PHI stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their patients' data.

5.      Defendants required their patients to provide sensitive PII/PHI and failed to protect

that information. Defendants had an obligation to secure patients' PII/PHI by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Defendants and Plaintiffs and Class Members.

6.      As a result of Defendants' failure to provide reasonable and adequate data security, Plaintiffs' and the Class Members' unencrypted, non-redacted PII/PHI has been exposed to unauthorized third parties. Plaintiffs and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive nature of the PII/PHI stolen here. Plaintiffs and Class Members face a substantial risk that their compromised PII/PHI will be misused, including through sale or disclosure on criminal data markets. This risk constitutes a concrete injury suffered by Plaintiffs and the Class, as they no longer have control over their PII/PHI, which is believed to now be in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7.      Plaintiffs and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8.      Plaintiffs bring this action on behalf of themselves and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Defendants to ensure that they implement and maintain reasonable data security practices going forward.

## **THE PARTIES**

9.      Plaintiff Walter Harvey, Jr. is a citizen and resident of Pinellas County, Florida,

3

where he intends to remain. Plaintiff Harvey received services from Boley Centers, Inc. and, as part of that relationship, provided his Private Information to Boley Centers, Inc.

10. Plaintiff Torrie Ritchie is a citizen and resident of Ocala, Marion County, Florida, where she intends to remain. Plaintiff Ritchie received services from Operation PAR, Inc. and, as part of that relationship, provided her Private Information to Operation PAR, Inc.

11. Defendant Boley-Par, Inc. is a Florida not-for-profit corporation, Florida Department of State Document No. N13000006666, with its principal place of business at 6655 66th Street North, Pinellas Park, Florida 33781. Its registered agent is Jim Miller, at the same address. Boley-Par, Inc. is the parent organization of Operation PAR, Inc., Boley Centers, Inc., and Personal Enrichment Through Mental Health Services, Inc., and provides financial, administrative, and information-technology systems to those entities.

12. Defendant Operation PAR, Inc. is a Florida not-for-profit corporation, Florida Department of State Document No. 717887, with its principal place of business at 6655 66th Street North, Pinellas Park, Florida 33781, providing substance-use-disorder treatment and behavioral-health services. Operation PAR, Inc. shares its principal place of business and senior management, including its Chief Executive Officer and Chief Financial Officer, with Defendant Boley-Par, Inc.

13. Defendant Boley Centers, Inc. is a Florida not-for-profit corporation, Florida Department of State Document No. 718784, with its principal place of business at 445 31st Street North, St. Petersburg, Florida 33713, providing mental-health, housing, veteran, and youth services. Its registered agent is Kevin Marrone, at the same address.

14. Non-party Personal Enrichment Through Mental Health Services, Inc., which does business as Eleos, is a Florida not-for-profit corporation, Florida Department of State Document No. 760262, with its principal place of business at 11254 58th Street North, Pinellas Park, Florida

4

33782, providing crisis, emergency-screening, inpatient, and community behavioral-health services. Eleos is part of the same affiliated corporate family as Defendants and, upon information and belief, patient and client data associated with Eleos was maintained within the same information-technology environment that is the subject of the Data Breach. Plaintiffs do not presently assert claims against Eleos and reserve the right to amend to add Eleos and an Eleos representative should discovery or further investigation support entity-specific claims.

15.     At all relevant times, Defendants collected, maintained, and controlled the Private Information of Plaintiffs and Class Members within a common information-technology environment, and each Defendant owed and undertook duties to safeguard that information. Defendants and their affiliate Eleos operate as an affiliated corporate family with centralized shared services: Boley-Par, Inc. serves as the parent organization and provides shared financial, administrative, and information-technology systems to Operation PAR, Inc., Boley Centers, Inc., and Eleos, and these entities share overlapping officers and directors. Among others, Jim Miller serves as an officer of both Boley-Par, Inc. and Operation PAR, Inc.; Amy Scholz serves as the chief financial officer of both Boley-Par, Inc. and Operation PAR, Inc.; and Lee Scharrer, Lynn Stone, and Maxine Booker each serve on the board of Boley-Par, Inc. while also holding senior positions at Personal Enrichment Through Mental Health Services, Inc. Upon information and belief, the Private Information of Plaintiffs and Class Members was collected and stored within a common information-technology environment that Boley-Par, Inc. maintained and operated for the benefit of all Defendants.

## **JURISDICTION AND VENUE**

16.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed

Class consists of at least 100 members; and at least one member of the proposed Class is a citizen of a State different from at least one Defendant, including affected persons who are citizens of states other than Florida and who were sent notice of the Data Breach, so that minimal diversity exists.

17.    This Court has general personal jurisdiction over each Defendant because each Defendant is incorporated in and maintains its principal place of business in the State of Florida, and is therefore at home in this State. This Court additionally has specific personal jurisdiction because the acts and omissions giving rise to this action occurred in Florida.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because each Defendant resides in this District, all Defendants are residents of the State of Florida, and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Venue is proper in the Tampa Division because Defendants reside and maintain their principal places of business in Pinellas County.

19.    Assignment to the Tampa Division is proper under Local Rule 1.04 because the events giving rise to this action occurred in Pinellas County, which lies within the Tampa Division.

## GENERAL ALLEGATIONS

20.    This is a class action brought by Plaintiffs, individually and on behalf of all persons who are similarly situated (i.e., the Class Members), seeking to redress Defendants' violations of their privacy rights. Plaintiffs and the other Class Members are individuals whose Private Information was collected, maintained, and stored by Defendants in connection with mental-health, substance-use-disorder treatment, crisis, and housing services.

21.    Between June 6, 2025, and June 10, 2025, an unauthorized third party accessed, and upon information and belief obtained, Plaintiffs' and the Class Members' PII/PHI.

22.    This action pertains to Defendants' unauthorized disclosures of Plaintiffs' and

Class Members' PII/PHI that occurred during the Data Breach.

23.     Defendants disclosed Plaintiffs' and the other Class Members' PII/PHI to unauthorized persons as a direct and/or proximate result of Defendants' failure to safeguard and protect their PII/PHI.

24.     By obtaining, collecting, and storing the PII/PHI of Plaintiffs and Class Members, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting the PII/PHI from unauthorized disclosures.

25.     Despite recognizing their duty to do so, Defendants failed to implement security safeguards to protect Plaintiffs' and the Class Members' PII/PHI.

26.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII/PHI and relied on Defendants to keep their PII/PHI confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that their third-party vendors take similar steps.

A. **The Data Breach**

27.     According to the Breach Notice posted on Defendant Boley Centers, Inc.'s website, Defendants detected unauthorized access to their network systems on or about June 10, 2025. Defendants determined that an unauthorized actor accessed and may have removed files from their systems between June 6 and June 10, 2025, and that the affected files included Private Information such as names, Social Security numbers, driver's license information, and medical information.

28.     Although Defendants detected the Data Breach on or about June 10, 2025, they did not complete their review of the affected data or begin notifying affected individuals until on or about July 2026—more than a year after detection. Defendants' delay was unreasonable and deprived Plaintiffs and Class Members of the earliest opportunity to take protective measures, in

direct conflict with Florida's requirement that breach notice be provided "as expeditiously as practicable and without unreasonable delay." Fla. Stat. § 501.171(4). During that entire period, Plaintiffs and Class Members were unaware that their Private Information had been compromised and were unable to take any protective measures.

29.    The Breach Notice posted on Defendants' website did not specify detailed measures or actions taken by Defendants to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

**B. Defendants' Data Security Obligations and the Applicable Standard of Care.**

30.    Because they create, receive, maintain, or transmit protected health information in connection with the services they provide, Defendants are subject to the data-security standards reflected in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §§ 1320d et seq., and the regulations promulgated thereunder.

31.    The HIPAA Security Rule requires covered entities, among other things, to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information that the covered entity creates, receives, maintains, or transmits, 45 C.F.R. § 164.306(a)(1); (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information, *id.* § 164.306(a)(2); (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted, *id.* § 164.306(a)(3); and (d) implement administrative, physical, and technical safeguards reasonably designed to protect the confidentiality, integrity, and availability of such information, *id.* §§ 164.308, 164.310, 164.312.

32.    In addition to the duty-of-care framework provided by HIPAA, Defendants' data-security obligations are informed by widely recognized federal and industry guidance. The Federal Trade Commission has long advised businesses that reasonable data security includes building security into operations from the outset, employing access controls and strong authentication,

conducting network monitoring and segmentation, providing secure remote access, applying timely patches, and implementing secure development practices.[1] The FTC has further explained that reasonable security includes inventorying stored personal information, securely disposing of unneeded data, encrypting sensitive information, understanding system vulnerabilities, and planning ahead for breaches.[2]

33.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for business.[3] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to address security issues. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[4]

34.    Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[5]

---

[1] *See* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015),
https://www.ftc.gov/business-guidance/resources/start-security-guide-business.
[2] *See* Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016),
https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[3] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016)
https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-inform
ation.pdf.
[4] *Id.*
[5] *Id.*

35.    Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII/PHI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

36.    The National Institute of Standards and Technology ("NIST") has published a comprehensive catalog of security and privacy controls that establishes objective benchmarks for reasonable security, including controls for access management, incident response, risk assessment, audit logging, authentication, and vendor management.[6] NIST has further published current best-practice guidance on incident response that aligns with the NIST Cybersecurity Framework 2.0.[7]

37.    The Center for Internet Security has published the CIS Critical Security Controls, a prioritized and actionable set of safeguards that maps to NIST and other authoritative frameworks and represents the consensus industry best practice for reasonable security.[8]

38.    The U.S. Department of Health and Human Services, through its 405(d) Program, has published cybersecurity guidance specifically addressed to the healthcare sector, identifying practical safeguards that healthcare organizations are expected to implement to address the sector's most significant threats, including email protection, endpoint protection, access management, data

---

[6] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5.
[7] *See* Nat'l Inst. of Standards & Tech., *Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile*, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.
[8] *See* Ctr. for Internet Sec., *CIS Critical Security Controls* (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1.

protection, vulnerability management, and incident response.[9] HHS has also published Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals, identifying foundational practices that the healthcare sector should prioritize, including vulnerability mitigation, email security, multi-factor authentication, encryption, credential management, and incident planning.[10]

39. The Office for Civil Rights of the Department of Health and Human Services ("OCR") has long published security guidance for covered entities and business associates, confirming that the basic safeguards and cyber preparedness obligations applicable to Defendants are longstanding regulatory expectations rather than novel or emerging duties.[11]

40. The Cybersecurity and Infrastructure Security Agency ("CISA"), in conjunction with the Multi-State Information Sharing and Analysis Center, has published the #StopRansomware Guide, which prescribes basic, well-established measures that organizations— including healthcare providers — are expected to implement to mitigate the threat of ransomware and similar intrusions, including phishing-resistant multi-factor authentication, prompt installation of operating-system and software updates, and ongoing user training.[12]

41. By collecting, using, and storing Plaintiffs' and Class Members' Private Information for their own benefit, Defendants assumed a duty to implement and maintain reasonable security measures consistent with applicable federal and industry standards. Defendants' duty included, but was not limited to, encrypting Private Information at rest and in

---

[9] *See* U.S. Dep't of Health & Human Servs., 405(d) Program, *Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients* (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf.

[10] *See* U.S. Dep't of Health & Human Servs., *Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals* (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf.

[11] *See* U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *Security Rule Guidance Material*, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

[12] *See* Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (updated Mar. 2025).

transit, implementing multi-factor authentication, deploying logging and monitoring systems sufficient to detect intrusions, maintaining current operating systems and software patches, training their workforce on data security and phishing risks, and implementing reasonable policies and procedures to detect, respond to, and contain security incidents.

### C. The Data Breach was Preventable

42. The Data Breach was foreseeable. The healthcare sector has long been a leading target of cyberattacks, and Defendants knew, or, in the exercise of reasonable care, should have known, that their network and the Private Information stored on it were likely targets of cybercriminals.

43. Federal regulators have repeatedly warned the healthcare sector about the foreseeable risk of cyberattacks. The HHS 405(d) Program and HHS's Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals were promulgated specifically because cyberattacks against healthcare entities were known to be common, foreseeable, and devastating to patients.[13] CISA has likewise issued ongoing public guidance for the healthcare sector regarding ransomware and similar intrusions.[14]

44. Numerous publicly reported cyberattacks against healthcare providers in the years preceding the Data Breach put Defendants on notice of the foreseeability of the Data Breach and of the categories of Private Information likely to be targeted. Healthcare providers have repeatedly been the subject of high-profile cyberattacks resulting in the compromise of patient PII and PHI in volumes ranging from tens of thousands to tens of millions of records. The healthcare sector's sustained position as one of the most-targeted sectors for cyberattacks is well documented.[15]

---

[13] *See* supra note 10.
[14] *See* supra note 11.
[15] *See* Identity Theft Resource Ctr., 2025 Annual Data Breach Report (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-

45. Had Defendants maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, they could have safeguarded patient data. Defendants' lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

46. Defendants were at all times fully aware of their obligation to protect patients' PII/PHI and the risks associated with failing to do so. Defendants knew that information of the type collected, maintained, and stored by Defendants is highly coveted and a frequent target of hackers.

47. This exposure, along with the substantial likelihood that the compromised PII/PHI may already be available to cybercriminals on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



48. By 2013, it was being reported that nearly one out of four data breach notification

Report.pdf (healthcare sector ranked second-most targeted industry with 534 compromises in 2025, behind only financial services (739); it had been the single most-targeted sector each year from 2018 through 2023 and remained among the top two in both 2024 and 2025).

recipients become a victim of identity fraud.[16]

49.    Stolen PII/PHI is often trafficked on the dark web. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

50.    When malicious actors infiltrate companies and copy and exfiltrate the PII/PHI that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[17]

51.    In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[18]

52.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[19]

53.    In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in

---

[16] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

[17] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

[18] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guide s/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.

[19] *Id.*

March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patients' personal information."[20]

54.     In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[21]

55.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[22]

56.     Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with personal information belonging to victims from countries all over the world. One of the key challenges of protecting

---

[20] *Id.*

[21] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

[22]  Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

PII/PHI online is its pervasiveness. "As data breaches in the news continue to show, PII/PHI about employees, patients, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[23]

57.    The PII/PHI of consumers remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[24] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[25] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[26]

58.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone

---

[23]*Stolen PII/PHI & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/st olen-PII/PHIramifications-identity-theft-fraud-dark-web/.

[24] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[25]  Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[26] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[27]

59.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

60.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[28]

61.     Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

62.     The PII/PHI compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are

---

[27] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[28] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

worth more than 10 times on the black market."[29]

63.    Once PII/PHI is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII/PHI being harvested from the victim, as well as PII/PHI from family, friends, and colleagues of the original victim.

64.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

65.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

66.    Data breaches facilitate identity theft, as hackers obtain consumers' PII/PHI and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell consumers' PII/PHI to others who do the same.

67.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII/PHI to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[30] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face

---

[29] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[30] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

"substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[31]

68.    The exposure of Plaintiffs' and Class Members' PII/PHI to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

### D. The Impact of Data Breach on Victims

69.    Defendants' failure to keep Plaintiffs' and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

70.    The PII/PHI exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII/PHI to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

71.    Further, malicious actors often wait months or years to use the PII/PHI obtained in

---

[31] *Id.*

data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII/PHI, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

72.    Given the nature and scope of the Data Breach, and upon information and belief, some victims of the Data Breach may already have suffered significant harms, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

73.    It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial-related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[32]

74.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

---

[32]IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/w p-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[33]

75. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

76. The unauthorized disclosure of sensitive PII/PHI to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[34]

77. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is

---

[33] *Id.*

[34] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

78.     As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.  The unconsented disclosure of confidential information to a third party;

b.  Unauthorized use of their PII/PHI without compensation;

c.  Losing the value of the explicit and implicit promises of data security;

d.  Losing the value of access to their PII/PHI permitted by Defendants without their permission;

e.  Identity theft and fraud resulting from the theft of their PII/PHI;

f.  Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g.  Anxiety, emotional distress, and loss of privacy;

h.  The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.  Unauthorized charges and loss of use of and access to their accounts;

j.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

k.  Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.  The continued, imminent, and certainly impending injury flowing from potential

fraud and identity theft posed by their PII/PHI being in the possession of one or more unauthorized third parties.

79.     Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically requires significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[35]

80.     Plaintiffs and Class Members place significant value in data security. According to a survey conducted by t h e cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider with better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[36]

81.     Plaintiffs and Class Members have a direct interest in Defendants' promises and duties to protect PII/PHI, i.e., that Defendants would *not increase* their risk of identity theft and fraud. Because Defendants failed to live up to their promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendants' wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for Defendants' wrongful conduct, namely their failure to adequately protect Plaintiffs' and the Class Members' PII/PHI.

---

[35] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.
[36] Richard Turner, *Beyond the Bottom Line:  The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

82.    Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through Defendants' wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII/PHI is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII/PHI; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

83.    Plaintiffs and Class Members have an interest in ensuring that their PII/PHI is secured and not subject to further theft, as Defendants continue to hold their PII/PHI.

**E.  Defendants Failed to Implement Reasonable Security Measures.**

84.    Notwithstanding the foreseeable risk of a cyberattack and the well-established standards of care set forth above, Defendants failed to implement reasonable security measures sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized access.

85.    The Data Breach itself is evidence that Defendants' data-security practices fell below the applicable standard of care. Upon information and belief, had Defendants implemented industry-standard measures—including, without limitation, encryption of stored Private

Information, phishing-resistant multi-factor authentication, network segmentation, robust logging and monitoring systems, prompt patching of known vulnerabilities, secure backup procedures, and adequate workforce training — the unauthorized third party would have been detected and stopped before Private Information could be removed from Defendants' network.

86.    Defendants' failure to detect the unauthorized access for some period of time and their lengthy delay in completing their investigation and notifying affected individuals further reflect deficient incident-response capabilities inconsistent with the standard of care set forth in NIST SP 800-61 Rev. 3 and the FTC's *Data Breach Response: A Guide for Business* (Aug. 2023).[37]

### F.  Plaintiff Harvey's Experience

87.    Plaintiff Walter Harvey, Jr. is a citizen and resident of Pinellas Park, Florida. In connection with services he received from Boley Centers, Inc., Plaintiff Harvey provided his Private Information to Boley Centers, Inc. with the reasonable expectation that it would be kept confidential and secure.

88.    Plaintiff Harvey received a notice letter informing him that his Private Information was involved in the Data Breach.

89.    Upon information and belief, the Private Information of Plaintiff Harvey exposed in the Data Breach included information provided by Plaintiff Harvey, including his name, address, email address, medical information, and Social Security number.

90.    Plaintiff Harvey has been notified that his personal information was identified on the dark web.

91.    Since the Data Breach, Plaintiff Harvey has experienced a significant increase in

---

[37] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

spam telephone calls and spam emails, consistent with the misuse of his exposed contact information.

92. Plaintiff Harvey has spent, and will continue to spend, time and effort responding to the Data Breach, including by monitoring his accounts and credit, monitoring incoming communications for indicia of identity theft, and considering and evaluating additional protective measures such as credit monitoring and the placement of fraud alerts or credit freezes.

93. As a result of the Data Breach, Plaintiff Harvey faces a present and continuing risk of identity theft and fraud arising from the exposure of his Social Security number, and upon information and belief his Private Information has been identified on the dark web.

### G. Plaintiff Ritchie's Experience

94. Plaintiff Torrie Ritchie is a citizen and resident of Ocala, Marion County, Florida. In connection with services she received, Plaintiff Ritchie provided her Private Information to Defendant Operation PAR, Inc. with the reasonable expectation that it would be kept confidential and secure.

95. On or about June 25, 2026, Plaintiff Ritchie received a notice letter from Operation PAR, Inc. informing her that her Private Information was involved in the Data Breach.

96. According to the data breach notice sent by Defendant Operation PAR to Plaintiff Ritchie, the Private Information of Plaintiff Ritchie exposed in the Data Breach included name, medical provider name, medical treatment and/or procedure information, diagnosis and/or clinical information, date of birth, medical number, social security number, prescription information, medical dates of service, and mental or physical condition.

97. Since the Data Breach, Plaintiff Ritchie has experienced a significant increase in spam telephone calls and spam emails, consistent with the misuse of her exposed contact

26

information. Additionally, there

98.    Plaintiff Ritchie has taken steps to protect herself in response to the Data Breach, including changing her account passwords.

99.    As a result of the Data Breach, Plaintiff Ritchie faces a present and continuing risk of identity theft and fraud, and has expended time and effort responding to and mitigating the effects of the Data Breach, including by changing her account passwords.

### H. Injuries Suffered by Plaintiffs and the Class.

100.    As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered, and will continue to suffer, injury and damages, including, but not limited to:

a) the unauthorized acquisition and disclosure of their Personal Information by criminal third parties, and the corresponding loss of privacy and confidentiality in that information;

b) a substantial and certainly impending increased risk of identity theft, financial fraud, medical identity theft, and other forms of misuse of their Personal Information—risks that justify and require ongoing expenditures for protective and remedial services;

c) lost time, lost productivity, and out-of-pocket expenses incurred to mitigate and remediate the consequences of the Data Breach, including the costs and effort associated with monitoring credit and financial accounts, placing and lifting fraud alerts and credit freezes, monitoring medical records and explanation-of-benefits statements, and obtaining identity theft and credit monitoring services;

d) the diminished value of their Personal Information, for which there is a well-documented economic market;

e) anxiety, concern, and emotional distress arising from the loss of control over their Personal Information and the ongoing risk of misuse of that information;

f) a marked increase in unsolicited telephone calls, electronic messages, and other communications consistent with the misuse of their Personal Information;

g) the deprivation of the benefit of the bargain in their relationship with Defendants, in that they paid Defendants (directly, through insurance, or through government funding) for mental-health, substance-use-disorder treatment, crisis, or housing services, and a portion of that consideration was understood to be allocated to the protection of their Personal Information, a service Defendants failed adequately to

27

provide; and

h) the continuing risk to their Personal Information, which remains in Defendants' possession and continues to be subject to further unauthorized access in the absence of adequate remediation.

## CLASS ACTION ALLEGATIONS

101. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed class (collectively, "the Class"), defined as follows:

> All natural persons in the United States whose Private Information was contained in files that Defendants determined were accessed, acquired, potentially removed, disclosed, or otherwise compromised in the data security incident that Defendants detected on or about June 10, 2025, including all persons who were sent notice of the Data Breach by or on behalf of Boley-Par, Inc., Operation PAR, Inc., and/or Boley Centers, Inc. (the "Nationwide Class" or the "Class").

102. In the alternative, and to the extent necessary to satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to represent the following Subclasses:

> Florida Subclass: All members of the Nationwide Class who are citizens of the State of Florida.
>
> Operation PAR Subclass: All members of the Nationwide Class whose Private Information was maintained by or provided to Operation PAR, Inc. Boley Centers Subclass: All members of the Nationwide Class whose Private Information was maintained by or provided to Boley Centers, Inc. SSN/DL Subclass: All members of the Nationwide Class whose Social Security number and/or driver's license information was involved in the Data Breach.

103. Excluded from the proposed Class are any officer or director of Defendants; any officer or director of any affiliate, parent, or subsidiary of Defendants; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff; and any individual whose Private Information was involved in the Data Breach solely in his or her capacity as a current or former employee, contractor, or job applicant of any

28

Defendant.

104.    **Numerosity:** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendants' own records.

105.    **Commonality and Predominance:** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a.    Whether Defendants owed a duty to safeguard the Private Information of Plaintiffs and Class Members;

b.    Whether Defendants breached that duty;

c.    Whether Defendants' security practices were reasonable;

d.    Whether the Data Breach was foreseeable;

e.    Whether Defendants' notice of the Data Breach was unreasonably delayed;

f.    Whether Plaintiffs and the Class are at an increased risk for identity theft because of the Data Breach;

g.    Whether Plaintiffs and the other Class Members are entitled to damages and equitable relief, including, but not limited to, injunctive relief and restitution.

106.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in both quantity and quality by comparison to the numerous questions that dominate this action.

107.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class Members, entrusted Private Information to Defendants and had that information

compromised in the same Data Breach as a result of the same conduct by Defendants.

108. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to those of the Class and have retained counsel competent and experienced in complex class action litigation. Plaintiffs will prosecute this action vigorously, and the interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

109. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create the potential for inconsistent or contradictory judgments, increasing delays and expenses for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiffs and the Class Against Defendants)*

110. Plaintiffs reallege paragraphs 1 through 109 as if fully set forth herein.

111. Plaintiffs bring this claim individually and on behalf of the Class.

112. To obtain mental-health, substance-use-disorder treatment, crisis, or housing services, Plaintiffs and Class Members were required to provide non-public personal and health information to Defendants. Plaintiffs and Class Members are current or former patients, clients, service recipients, or other non-employment individuals who entrusted their sensitive PII/PHI to Defendants in connection with Defendants' services. That information was collected, stored, and maintained by Defendants as part of their operations, and Plaintiffs and Class Members reasonably expected Defendants to safeguard their information consistent with Defendants' legal and contractual obligations.

113. By collecting, storing, sharing, and using individuals' data on Defendants' shared computer network in the operation of their business, Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PII/PHI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing their data security systems to ensure that Plaintiffs' and Class Members' PII/PHI in Defendants' possession was adequately secured and protected.

114. Defendants owed a duty of care to Plaintiffs and Class Members to maintain data security according to industry standards and other relevant requirements. Defendants were also responsible for ensuring their systems, networks, and personnel adequately protected the Private Information.

115. Defendants' duty of care to use reasonable security measures arose from the relationship between Defendants and Plaintiffs and Class Members, who entrusted their sensitive PII/PHI to Defendants in connection with mental-health, substance-use-disorder treatment, crisis, or housing services. This duty arises under common-law principles requiring reasonable care in

31

safeguarding confidential information, and its scope is informed by the standard of care reflected in HIPAA, among other authorities. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from a Data Breach.

116.    Defendants' common-law duty to implement reasonable security measures to safeguard confidential data from both intentional and unintentional use or disclosure is informed by the standard of care reflected in HIPAA, including the administrative, technical, and physical safeguards described in the HIPAA Security Rule. Some or all of the healthcare, medical, and related information involved in this case qualifies as "protected health information" within the meaning of HIPAA.

117.    In addition, the reasonable-security standard applicable to Defendants is informed by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, under which the FTC has treated the failure to use reasonable measures to protect confidential data as an unfair practice. Plaintiffs assert no private cause of action under Section 5 and references it solely as evidence of the applicable standard of care.

118.    Defendants breached their duties by failing to exercise reasonable care and failing to safeguard and protect Plaintiffs' and the other Class Members' PII/PHI.

119.    It was reasonably foreseeable that Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class Members' PII/PHI would result in an unauthorized third-party gaining access to such information for no lawful purpose.

120.    As a direct result of Defendants' breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class Members' confidential information, Plaintiffs and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain,

exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

121.    Neither Plaintiffs nor other Class Members contributed to the Data Breach as described in this Complaint.

122.    Defendants' wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

123.    As a result of Defendants' above-described wrongful actions, inaction that directly and proximately caused the Data Breach, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) the diminished value of data-security protections promised for Plaintiffs' and Class Members' information.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiffs and the Class)*

124.    Plaintiffs reallege paragraphs 1 through 109 as if fully set forth herein.

125.    When Plaintiffs and Class Members provided their Private Information in connection with obtaining mental-health, substance-use-disorder treatment, crisis, or housing

services from Defendants, and Defendants thereafter collected, stored, and maintained that information as part of their operations, Plaintiffs and Class Members entered into implied contracts with Defendants under which Defendants agreed to reasonably safeguard and protect their Private Information.

126.    Defendants solicited, received, accessed, stored, and processed Plaintiffs' and Class Members' Private Information as part of their regular operations, including mental-health, substance-use-disorder treatment, crisis, and housing services. Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation that it would be safeguarded and protected from unauthorized access.

127.    In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations, including HIPAA, and adhered to industry standards applicable to the protection of sensitive healthcare and insurance information.

128.    Plaintiffs and Class Members paid money, directly, through insurance, or through government funding, for treatment and related services, with the reasonable belief and expectation that a portion of those payments would be used to implement and maintain adequate data security measures. Defendants failed to maintain reasonable and adequate data security.

129.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in connection with obtaining treatment and related services in the absence of the implied contracts under which Defendants agreed to keep such information reasonably secure.

130.    Plaintiffs and Class Members would not have provided their Private Information to Defendants, or permitted that information to be collected and maintained by Defendants, absent Defendants' implied promises to monitor their computer systems and networks and to adopt

34

reasonable data security measures to protect that information from unauthorized access.

131.   Defendants breached their implied contract with Plaintiffs and Class Members by failing to safeguard and protect their Private Information.

132.   As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

133.   Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

134.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, inter alia: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring and identity protection services to all Class Members.

## COUNT III
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

135.   Plaintiffs reallege paragraphs 1 through 109 as if fully set forth herein.

136.   Plaintiffs and Class Members conferred a benefit upon Defendants in the form of their Private Information, which Defendants collected, stored, and used in connection with treatment and related services, with the implicit understanding that Defendants would adequately safeguard the PII/PHI entrusted to them. Additionally, Defendants received payment for treatment and related services provided to Plaintiffs and Class Members.

137.   Defendants accepted and had knowledge of the benefits conferred upon them by Plaintiffs and Class Members, including access to, use of, and reliance upon their PII/PHI in the ordinary course of their operations. Defendants further benefited financially from providing treatment and related services to Plaintiffs and Class Members while retaining and utilizing their

sensitive information.

138.   As a result of Defendants' conduct, Plaintiffs and Class Members suffered actual damages.

139.   Defendants should not be permitted to retain monies paid to them for services involving Plaintiffs' and Class Members' information because Defendants failed to adequately implement the data privacy and security procedures required by applicable laws and industry standards.

140.   Defendants should be compelled to provide, for the benefit of Plaintiffs and Class Members, all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT IV**
**DECLARATORY JUDGMENT**
28 U.S.C. §§ 2201–2202
*(On Behalf of Plaintiffs and the Class)*

141.   Plaintiffs reallege paragraphs 1 through 109 as if fully set forth herein.

142.   An actual controversy has arisen between Plaintiffs and Class Members on the one hand, and Defendants on the other, concerning Defendants' data security obligations to safeguard the Private Information of Plaintiffs and Class Members and the adequacy of Defendants' ongoing data security practices.

143.   Plaintiffs and Class Members continue to be at substantial and continuing risk of injury arising from the permanent compromise of their Social Security numbers, medical and diagnostic information, and other Private Information, and they remain dependent on Defendants' ongoing data security practices to prevent further unauthorized access to or disclosure of their Private Information that may remain in Defendants' possession or in the possession of Defendants' affiliates, program partners, and service providers.

144. Defendants' ongoing data security practices have not been demonstrated to be reasonable, and Defendants continue to maintain Private Information regarding Plaintiffs and Class Members in environments substantially similar to those that were compromised in the Data Breach.

145. Plaintiffs and Class Members seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (a) Defendants' existing data security practices are not reasonable and do not comply with applicable legal and industry standards, including the standard of care reflected in the HIPAA Security Rule; (b) Defendants owe a continuing duty of care to safeguard the Private Information of Plaintiffs and Class Members; and (c) Defendants must implement and maintain reasonable administrative, technical, and physical safeguards, consistent with the standard of care reflected in the HIPAA Security Rule and current industry standards, to protect the Private Information of Plaintiffs and Class Members on an ongoing basis.

146. Plaintiffs and Class Members also seek such further necessary or proper relief based on the declaratory judgment as the Court may grant pursuant to 28 U.S.C. § 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

(a) Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

(b) Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, restitution, and disgorgement;

(c) Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices

to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

(d)     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

(e)     Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

(f)     Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: July 8, 2026

Respectfully submitted,

*/s/ Robert R. Jimenez*
Robert R. Jimenez (Bar No. 72020)
**BRYSON HARRIS SUCIU
& DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
(786) 206-7896
rjimenez@brysonpllc.com
lblanco@brysonpllc.com

*Counsel for Plaintiffs and the Class*